# EXHIBIT 1



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, 21ST CAVALRY BRIGADE (AIR COMBAT)
III CORPS AND FORT HOOD
FORT HOOD, TEXAS 76544-5000

REPLY TO
ATTENTION OF:

AFVU-CAV                                                                                             22 May 2014

MEMORANDUM FOR Commander, 13th Sustainment Command (Expeditionary), Fort Hood, Texas 76544

SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion (MCB)

1. On 16 April 2014, LTC Myron Bell, Commander, 49th Movement Control Battalion (MCB), conducted a sensing session of staff officers, NCO's and Soldiers reference Behavioral Health Support the staff was receiving and the climate within the staff following an active shooter event. On 2 April 2014 2014, the battalion had an active shooter event where members of the battalion were killed and wounded. The shooting at the 49th MCB occurred during a staff meeting held by the Executive Officer (XO), MAJ Toby Mackall. Following the 16 April sensing session, LTC Bell notified MAJ Mackall that he was recommending a change of duty and he would no longer serve as the Battalion XO. LTC Bell spoke to his brigade commander, COL Luedecking, and MAJ Mackall was removed from the XO position. On 29 April 2014, BG Lemasters, Commander, 13th ESC appointed me as a 15-6 IO to investigate the circumstances surrounding the change of duty for MAJ Mackall. (Exhibit 1).

2. The investigation was conducted to provide findings and recommendations on the change of duty and include answers as follows:

   a. Was MAJ Mackall's ability to serve as the XO compromised by the underlying circumstances that led to the change of duty?

   b. Was the change of duty warranted given his previous service in the unit prior to the 2 April 2014 shooting, the complaints of his subordinates and the battalion's imminent deployment?

   c. Did any individuals engage in illegal or inappropriate means to damage or undermine MAJ Mackall's reputation in the unit?

3. My investigative plan was to interview key members of the staff and battalion to gauge the "staff climate" under MAJ Mackall to determine how effective his leadership was, any underlying friction points between MAJ Mackall and the staff, as well as his performance. I would also ask questions to determine the circumstances surrounding MAJ Mackall's actions on 2 April 2014 and how those actions impacted the staff's climate and trust in MAJ Mackall's ability to lead. Finally, interview the Brigade and Battalion Commanders to determine their reasoning and actions on the change of duty decision.

4. Summary of the Facts. The facts and circumstances surrounding the change of duty of MAJ Mackall are as follows:

   a. Army Regulations: AR 600-20, Army Command Policy, prescribed the policies and responsibilities of a Commander. This regulation provides the leader with both generic and specific


Printed on Recycled Paper

AFVU-CAV
SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion

responsibilities he has as a Commander. Section 1-5C states, "The commander is responsible for establishing leadership climate of the unit and developing disciplined and cohesive units. This sets the parameters within which command will be exercised and, therefore, sets the tone for social and duty relationships within the command". It's the Commander's responsibility to ensure a climate exists within the organization that allows for the accomplishment of the mission. Also, the AR expands on this climate responsibility by stating in Section 1-5 c. (3) (c), "Commanders should assess the command climate periodically to analyze the human dimension of combat readiness. Soldiers must be committed to accomplishing the mission through the unit cohesion developed as a result of a healthy leadership climate established by the command. Leaders at all levels promote the individual readiness of their Soldiers by developing competence and confidence in their subordinates" and "Commanders are responsible for developing disciplined and cohesive units sustained at the highest readiness level possible". Finally, in Chapter 2, Section 2-1, b, the AR describes the Commanders overall responsibility for the command and his authority to assign responsibility and in essence assign duties to his subordinates, "Commanders are responsible for everything their command does or fails to do. However, commanders subdivide responsibility and authority and assign portions of both to various subordinate commanders and staff members. Commanders delegate sufficient authority to Soldiers in the chain of command to accomplish their assigned duties, and commanders may hold these Soldiers responsible for their actions. Commanders who assign responsibility and authority to their subordinates still retain the overall responsibility for the actions of their commands". (Exhibit 2)

    b. <u>Army Regulations</u>: AR 623-3, Evaluation Reporting System, provides the Army's regulatory guidance on performance evaluations and provides us a definition for "relief for cause", when a relief for cause evaluation is required and when a change of duty evaluation is required. Paragraph 3-34 states, "A code 04, "Change of Duty" evaluation report, is mandatory when a rated Soldier is reassigned to a different principal duty while still serving under the same rater or when he or she is separated from Army service. The reason for submission will reflect the event that warranted the generation of an evaluation report (that is, change of duty, discharge, separation, or retirement)". Paragraph 3-54 states, "Relief for Cause is defined as an early release of an officer from a specific duty or assignment directed by superior authority and based on a decision that the officer has failed in his or her performance of duty. In this regard, duty performance will consist of the completion of assigned tasks in a competent manner and compliance at all times with the accepted professional officer standards consisting of attributes and competencies as part of the Leadership Requirements Model". Finally, the AR helps us by defining the term "relief". In the Glossary relief is, "The removal of a rated Soldier from an assigned position based on a decision by a member of the Soldier's chain of command/supervisory chain that his or her personal or professional characteristics, conduct, behavior, or performance of duty warrant his or her removal from the position in the best interests of the U.S. Army". (Exhibit 3)

    c. <u>Performance</u>: MAJ Toby Mackall was assigned as the Executive Officer of the 49th MCB on 24 June 2013 (Exhibit 4) and through interviews with both the Brigade Commander and Battalion Commander his performance as the Battalion Executive Officer was satisfactory. In his sworn statement COL Luedecking the Brigade Commander describes MAJ Mackall as "a great officer, professional (who) works well under pressure". (Exhibit 5). Neither officer felt MAJ Mackall's performance was lacking in any substance and that he was a strong, aggressive Executive Officer that performed his duties well.

AFVU-CAV
SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion

d. Climate of the Staff: I conducted 14 separate interviews with either current or former staff Officers, NCO's and enlisted Soldiers from the 49th MCB. An element of the interview was to determine the climate of the staff under the direction of MAJ Mackall. The vast majority of the interviewees described MAJ Mackall as an aggressive, hard charging officer that demanded high standards. While those are attributes we want in our leaders, it was evident the climate under MAJ Mackall was not entirely healthy and at times toxic. CPT Guikema described MAJ Mackall as, "a very demanding XO, always pushing myself and subordinates to do more". He also stated that MAJ Mackall would correct staff mistakes in a public forum and that there were ones he "picked on more than others but most avoided him altogether". (Exhibit 6). CPT McKenzie, the HHD Commander also provided a similar description of MAJ Mackall's leadership style and that the staff did not react well to this style. (Exhibit 7). In CPT Griffen's sworn statement he stated that after talking to other staff members he believed "the general feeling of MAJ Mackall was not favorable". (Exhibit 8). SGT Long described MAJ Mackall's as "possessing of such an extreme personality that it alternates being amusing and frustrating". (Exhibit 9). 1LT Hemming described conversations with her fellow staff officers where the XO singled them out and belittled them during staff meetings. 1LT Hemming felt this caused a "tense environment that produced negative results". (Exhibit 10). CPT Davis described the XO's leadership style as "aggressive" and the tone used with the staff was "poisonous". She felt that when she was around MAJ Mackall she was always on "pins and needles". (Exhibit 11). CPT Jackson, who was a former SFC (P) prior to attending OCS, described MAJ Mackall as someone who would set high standards but not keep them himself. She described MAJ Mackall as having a "cocky demeanor and toxic leadership style" and he "talked down to everyone". (Exhibit 12). 1LT Herring described an atmosphere "in which no matter what we did it wasn't good enough". (Exhibit 13). Finally, while not a member of the staff, there was a strained relationship between CSM Culp and MAJ Mackall. This relationship was strained at best and toxic at its worst. CSM Culp described incidences of conflict with MAJ Mackall that led to arguments in front of the staff and incidents where staff officer came to her to get guidance on how to deal with the XO's leadership style. (Exhibit 14). During his tenure as the Battalion XO there were other instances that indicated an unhealthy climate.

(1) Relationship with 1LT Farris. While not a focus of this investigation, the relationship between 1LT Farris and MAJ Mackall was discussed by many of the interviewees. 1LT Farris served as the Battalion Motor Officer from 13 July 2013 until approximately February 2014 when she PCS'd from Fort Hood. The relationship between the two officers was so poor that 1LT Farris filed an EO complaint on 10 Oct 2013. (Exhibit 15). The 4th Sustainment Brigade EO Advisor conducted an informal investigation and sensing session and found there were no violations of EO but there was evidence of poor climate within the staff. The EO Advisor made recommendations that MAJ Mackall receive counseling on specific areas. (Exhibit 16). COL Luedecking verbally counseled MAJ Mackall per the EO Advisors recommendations. (Exhibit 5).

(2) Allegations of Senior Leader Misconduct. While not a focus of this investigation, COL Luedecking, LTC Bell and MAJ Mackall provided background information on allegations of senior leader misconduct in the battalion that were made by MAJ Mackall against 1LT Farris and CSM Culp. On 17 and 18 December 2013, MAJ Mackall presented LTC Bell with two documents requesting an inquiry or investigation into potential misconduct by 1LT Farris and CSM Culp. (Exhibit 17). LTC Bell did not action these allegations until January 2014 when he conducted an informal inquiry into the allegations by speaking with the officer and NCO involved. LTC Bell

3

AFVU-CAV
SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion

continued his inquiry into March when he spoke with the Brigade Legal Advisor who opined that no misconduct had occurred. March 2014 was the first time the Brigade Commander was aware of the allegations and after an SJA review he signed a memorandum for record that with legal counsel, he determined none of the actions were misconduct but they did reveal a poor command climate which he and LTC Bell would rectify. (Exhibit 18). MAJ Mackall was not satisfied with the results of these informal inquiries, filed an ongoing IG complaint and feels this is one of the reasons he was removed from duty as the XO. (Exhibit 19).

(3) Insensitivity to Behavioral Health Support. MAJ Mackall feels that an additional reason he was removed from the XO position was "as a result of false allegations of members of the battalion staff stating insensitivity and not supporting personnel seeking health professionals." (Exhibit 19) On 15 April, MAJ Mackall held a staff meeting and 1LT Herring was not present as she was attending a behavioral health appointment. CPT Guikema felt MAJ Mackall discouraged attending behavioral health sessions when he questioned why 1LT Herring missed the meeting and stated she should have made the appointment at another time. (Exhibit 6). CPT Davis also felt that MAJ Mackall was insensitive during this incident (Exhibit 1). 1LT Herring felt that while MAJ Mackall would say he supported others seeking behavioral health support, "there was an expectation we shouldn't need it." (Exhibit 6). During the interviews when asked if this was an isolated incident, most stated they could not recall MAJ Mackall dismissing behavioral health support but that he strongly felt they needed to continue their mission and their jobs in spite of the shooting. Many felt they did not have time to grieve and heal and were thrust right back into a rapid OPTEMPO as the unit prepared for deployment. Finally, LCDR Simpson, the Fort Hood Behavioral Health Officer, felt MAJ Mackall was supportive of his mission to provide support to the batttalion. (Exhibit 20).

e. April Active Shooter Event: On 2 April 2014 2014, an active shooter event occurred within the 49th MCB during a staff meeting being held by MAJ Mackall. In the room were officers, NCOs and Soldier assigned to the 49th MCB staff and HHD. During the event, SFC Ferguson was shot and killed as he prevented the shooter from entering the room. All those that attended the meeting were present except MAJ Mackall and the Battalion Chaplain who exited the room when the shooting began and did not return until the shooter had departed and the area secured. MAJ Mackall states, "It was not my intent to leave anyone behind but a natural response to an event of this magnitude." (Exhibit 19).

f. Post 2 April 2014 Staff Climate: MAJ Mackall's actions on 2 April 2014 2014 had a profound impact on the staff. From the numerous interviews of those in the room during the shooting it's evident that many of them lost faith and trust in MAJ Mackall as their leader and were concerned of his action during the upcoming deployment. CPT Guikema, who was present in the room on 2 April 2014, stated that when everyone took cover, MAJ Mackall ran. He felt MAJ Mackall abandoned them and that his credibility was diminished. "It was the XO's meeting and he left us." (Exhibit 6). SGT Long, who was present in the room on 2 April 2014, described MAJ Mackall's actions as those of a selfish coward; and he stated that the mood of the staff towards the XO became increasingly negative. (Exhibit 9). 1LT Cook, who was present in the room on 2 April 2014, felt he could overlook MAJ Mackall's actions, but that the incident impacted MAJ Mackall, who became withdrawn. 1LT Cook stated he would have reservations deploying with MAJ Mackall. (Exhibit 21). CPT Griffen, who was present in the room on 2 April 2014, felt that when MAJ Mackall left the room, he did so with no regard for the safety and welfare of his subordinates. He also stated that

4

AFVU-CAV
SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion

junior Soldiers approached him with concerns about "a field grade officer running for his life." (Exhibit 8). 1LT Hemming did not feel this way, but rather felt it was a flight or fight response. She was not concerned that MAJ Mackall reacted with flight, but she acknowledged that others on the staff were concerned. (Exhibit 10). SPC Hawkins, who was present in the room on 2 April 2014, also felt abandoned and wondered what MAJ Mackall would do in stressful conditions found in Afghanistan. (Exhibit 22). CPT Davis, who was present in the room on 2 April 2014, felt abandoned and expressed that a leader should take care of their Soldiers "no matter what." (Exhibit 11). Finally, CPT Jackson's statement was the most strongly worded where she felt the 2 April 2014 incident was "like icing on the cake" and that "any respect MAJ Mackall had from the staff was lost." She stated the unit was filled with emotions and that "no one could stand to be around him." (Exhibit 12).

    g. <u>LTC Bell's Decision and MAJ Mackall's Reaction:</u> After the 15 April 2014 XO meeting where MAJ Mackall made comments about 1LT Herring attending a Behavioral Health appointment instead of attending the IPR, CPT Guikema and 1LT Herring relayed these comments to LTC Bell. On 16 April 2014, LTC Bell held a sensing session of the personnel present in the room on 2 April 2014 during the shooting to determine if they were receiving adequate support in dealing with the incident. During this session it was evident there was a "shared feeling of mistrust and abandonment of and by MAJ Mackall" and that all personnel in the room stated "they could not follow MAJ Mackall into combat based on his actions during the shooting incident." LTC Bell felt he could not overcome this climate and that MAJ Mackall could not overcome the loss of trust and confidence by his subordinates and he informed MAJ Mackall he would be reassigning him. (Exhibit 23). LTC Bell then informed COL Luedecking who concurred with his recommendation. COL Luedecking met with MAJ Mackall that day and told him he agreed with LTC Bell. The next day COL Luedecking again met with MAJ Mackall where he was presented a memorandum titled "Article 138 Request for Redress." In his memo, MAJ Mackall wrote that he believed he was removed as the XO due to members of the staff having a perception he was insensitive to them seeking behavioral health treatment, that it was an attempt by certain members of the staff to discredit his leadership style and character, that he was being targeted as the reason for the poor command climate in the unit, and finally that his change of duty was in reprisal to his filing an IG complaint into his allegations of senior leader misconduct. (Exhibit 24 and 19).

   5. <u>Findings.</u> After carefully considering the evidence, I find that the change of duty for MAJ Mackall was within LTC Bell's command authority as prescribed in AR 600-20 and AR 623-3. LTC Bell, as the Commander, is responsible for establishing a leadership climate of the unit and developing disciplined and cohesive units. It was LTC Bell's responsibility to ensure a climate exists within the organization that allows for the accomplishment of the mission. LTC Bell is responsible for all his unit does or fails to do and must ensure his organization has the proper climate and leaders to accomplish the mission. From his 16 April 2014 sensing session with the staff present on 2 April 2014, LTC Bell felt the staff could no longer follow MAJ Mackall into combat based on his actions during the shooting incident and that MAJ Mackall could not overcome the loss of trust and confidence by his subordinates. Additionally, I find the following in response to the questions as put forth in the orders designating me as the IO.

    a. Was MAJ Mackall's ability to serve as the XO compromised by the underlying circumstances that led to the change of duty? I find that MAJ Mackall's ability to perform his duties was severely

5

AFVU-CAV
SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion

compromised by his response and actions during the 2 April 2014 shooting which led to LTC Bell deciding to conduct the change of duty. Through my investigation I find that MAJ Mackall lost the trust and faith in his subordinates due to his actions and could not overcome this factor. Additionally, the climate that MAJ Mackall had with his staff prior to 2 April 2014 was unhealthy and this more than likely contributed to the strong feelings the staff presented to LTC Bell during the 16 April sensing session.

   b. Was the change of duty warranted given his previous service in the unit prior to the 2 April 2014 shooting, the complaints of his subordinates and the battalion's imminent deployment? I find that change of duty was warranted given his previous service in the unit. While both the Brigade and Battalion Commander felt MAJ Mackall's performance was strong there was an unhealthy climate within the staff. It's evident from the many statements that MAJ Mackall's leadership style created an atmosphere of tension and unhealthiness that impacted the staff's ability to perform as individuals and as part of a highly effective team. Ultimately, this may have had significant impacts on mission accomplishment in a high stress and high OPTEMPO combat deployment. Many of the staff had doubts about MAJ Mackall's leadership in combat and this was a factor in LTC Bell's decision.

   c. Did any individuals engage in illegal or inappropriate means to damage or undermine MAJ Mackall's reputation in the unit? I find that no individual engaged in an illegal or inappropriate means to damage MAJ Mackall's reputation. His change of duty was not in retaliation for an IG complaint, for a poor command climate, for his allegations of misconduct against certain leaders in the battalion or for a perceived insensitivity towards behavioral health treatment. COL Leudekings' statement clearly defined why MAJ Mackall was removed as the Executive Officer of the 49th MCB, "the decision to remove Toby (MAJ Mackall) was not a result of poor decisions made on his part or insensitivity about concerns for continued behavioral health care. The decision was made because of reports we received from multiple people that they had lost the trust and faith in the ability of MAJ Mackall as a leader". (Exhibit 5). While the relationship with CSM Culp was strained, the allegations MAJ Mackall made against her were found by 4th SB legal to not be misconduct. Throughout my interviews I did not detect any indication there was an effort by the staff as a whole to have MAJ Mackall removed from duty or any concerted effort by an individual to undermine or damage MAJ Mackall. I found the normal complaints and gripes by a staff with their XO but exacerbated by the unhealthy environment MAJ Mackall had with them.

6. Recommendations. In view of the above findings, I have the following recommendations:

   a. LTC Bell and COL Leudeking should formally counsel MAJ Mackall into the reason he was removed from duty at the Battalion XO. From his statement and interview MAJ Mackall is not clear on the reasons why he was removed. As described in this document, MAJ Mackall feels he was being singled out in an organized conspiracy to undermine him and have him removed. That is not the case, nor is there any evidence of reprisal. The chain of command owes MAJ Mackall a detailed counseling on why he was removed and what actions he can take to change as a leader and prevent these actions from occurring again.

   b. LTC Bell should review and understand Fort Hood Regulation 27-10 as it pertains to senior leader misconduct and should action future allegations in a more efficient and timely manner. MAJ

AFVU-CAV
SUBJECT: Findings and Recommendations for Investigation into the Change of Duty of MAJ Toby Mackall, Executive Officer, 49th Movement Control Battalion

Mackall presented the allegations on 17 Dec 2013 and the final determination was not made until four months later.

    c. LTC Bell should conduct a command climate survey of the battalion and work with COL Leudeking to develop ways to improve the climate. LTC Bell should be counseled and trained by the Brigade Commander on how to implement corrective actions on improving a poor command climate as he either is not aware of how to design and implement such changes or he neglected to do so in his command. LTC Bell was aware of the poor relationship between MAJ Mackall and CSM Culp and should have been aware of the unhealthy environment within his staff that impacted the overall command climate of the unit.

7. The point of contact for this memorandum is the undersigned at (254) 553-0015, and john-white@us.army.mil.

Encl
as

JOHN C. WHITE
COL, AV
Investigating Officer